**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA MEYERPETER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CV-00748-NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Donna Meyerpeter's ("Meyerpeter") applications for disability insurance benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Meyerpeter alleges disability due to major depressive disorder and asthma [Doc. 1], as well as anxiety, heart palpitations, memory lapses, poor focus, pain, aggression, and low energy. (Tr. 145.) All parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Doc. 8] For the reasons set forth below, the Commissioner's decision is affirmed.

## I.
## PROCEDURAL BACKGROUND

On June 20, 2008, Meyerpeter filed an application for a period of disability, seeking DIB and SSI. She alleged an onset date of May 10, 2008. (Tr. 108, 112.) The Social Security Administration ("SSA") denied Meyerpeter's claim and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 58, 64.) The SSA granted Meyerpeter's

request and the hearing took place on November 23, 2009. (Tr. 20-51, 78.) The ALJ issued a written decision on January 20, 2010, upholding the denial of benefits. (Tr. 6-14.)

Meyerpeter requested review of the ALJ's decision from the Appeals Council on February 5, 2010. (Tr. 107.) On February 23, 2011, the Appeals Council denied Meyerpeter's request for review. (Tr. 1-5.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, 422.210(a)). Meyerpeter filed this appeal on April 28, 2011. [Doc. 1.] The Commissioner filed an answer on July 7, 2011. [Doc. 11] Meyerpeter filed a Brief in Support of Plaintiff's Complaint. [Doc. 13] The Commissioner filed a Brief in Support of the Answer. [Doc. 16]

## II.
## ADMINISTRATIVE RECORD

### A.    Hearing Testimony

On November 23, 2009, ALJ Bradley Hanan held a hearing. (Tr. 20-51.) The ALJ heard testimony from Meyerpeter (Tr. 28-47) and Delores Gonzales, a vocational expert ("VE") (Tr. 47-51). Meyerpeter was represented by counsel. (Tr. 22.)

#### 1.    Claimant's Testimony

Meyerpeter testified she was forty-five years old on the date of the hearing. (Tr. 28.) Meyerpeter testified she lived with her mother who has Alzheimer's disease and her pregnant 18-year-old daughter. (Tr. 29, 39.) She stated she owed on a mortgage on the house, which was under her name, and she had been taking cash advances on her credit cards in order to pay for it. (Tr. 29-30.)

Meyerpeter testified that her parents removed her from high school in the tenth grade due to depression and bipolar disorder. (Tr. 39.) She also testified that she earned her GED, but had

no other college or vocational training.  (Tr. 31.)  Meyerpeter stated she had an unrestricted valid driver's license, which she used to drive herself approximately three days per week to doctor's appointments and to a part-time job.  (Tr. 30.)

Meyerpeter stated she worked two days per week selling eyeglasses and had worked there on and off for five years.  (Tr. 31, 35.)  Meyerpeter testified that she "work[s] patients up to see the doctor or help[s] show glasses."  (Tr. 32.)  She also stated that she was on her feet most of the time during work.  (Tr. 32.)  She also testified that "working up" patients involved asking patients questions from a form and completing the form.  (Tr. 35.)  Meyerpeter stated she had done the same type of job with different employers since she was 16 years old.  (Tr. 36.) Meyerpeter testified that the frequency of her work has depended on how she felt when she was called and that her employer continued to call her even though she had turned them down for work in the past.  (Tr. 31-32.)  She also testified that her employer only called if someone else was sick or not at work.  (Tr. 31.)

Meyerpeter testified she could not work five days per week, because she "can't function on a daily basis" and has to "drag [herself] into work."  (Tr. 32.)  She testified that she has had this problem since she was little.  (Tr. 32.)  She also testified that at the end of the day, her heart bothers her so much that she goes straight home and goes to bed.  (Tr. 32.)  She stated she always tried to work part-time.  (Tr. 33.)

Meyerpeter testified that she had been fired from a previous job because she began to work fewer days when work became "too much" for her.  (Tr. 36-37.)  She stated that it "was too hard to get into work every day to deal with people every day."  (Tr. 37.)  She also stated she had trouble concentrating and remembering, and she was easily agitated.  (Tr. 37.)  Meyerpeter stated

that she quit another job, because it was hard for her to get up every day to go to work, brush her teeth, and take a shower.  (Tr. 35.)

Meyerpeter testified that a combination of things kept her from working full time, including bipolar disorder, depression, heart palpitations that never go away, and the stress.  (Tr. 42.)  She stated that the stress comes from taking care of her mom with Alzheimer's disease and her pregnant teenage daughter.  (Tr. 42.)  She testified that she was hospitalized due to her depression, bipolar disorder, and stress once in 1991.  (Tr. 42.)  She also testified that different psychiatrists have recommended that she be hospitalized many times since then, but she cannot afford it.  (Tr. 42-43.)

Meyerpeter stated that had attended outpatient therapy, regular psychiatrists, and other therapists before, but it did not work.  (Tr. 44.)  She also testified that her medications "kind of keep [her] calm and help the heart palpitations," but they also cause her to have trouble with remembering and focusing.  (Tr. 43.)  Meyerpeter testified that she did not take the medications when she went to work because of the problems they caused with her memory and focus, but then she would become "so depressed in the mornings [she] could hardly get to work."  (Tr. 43.)

Meyerpeter testified that she had abstained from alcohol for "probably five, six years," because it intensified the severity of her heart palpitations.  (Tr. 37.)  She also testified that she spends her time trying to function, cleaning, shopping, helping her mom and doing laundry.  (Tr. 44-45.)  She stated that while she sleeps every chance she gets, she does not sleep for more than two hours straight at nighttime.  (Tr. 46.)  Meyerpeter also stated she has never felt well rested and her doctors told her it is because of the depression and bipolar disorder.  (Tr. 46.)

### 2. VE Delores Gonzales's Testimony

The VE testified that Meyerpeter's past relevant work as an optician's assistant is classified as sedentary, semi-skilled work and her past relevant work as a retail sales clerk is classified as light, semi-skilled work.  (Tr. 48.)

The ALJ posed the following hypothetical to the VE:

> Assume for a minute a person the claimant's age, education, and work experience was limited to work within the light exertional category is unable to climb ladders, ropes, or scaffolds at any time, is to avoid concentrated exposure to cold, heat, wetness, and humidity, limited to work that is simple, routine, and repetitive; and limited to work that does not require any quotas.  Can those limitations with such a person be able to perform any of the claimant's past work that you described?

(Tr. 48.)  The VE testified that such an individual could not do Meyerpeter's past relevant work because the hypothetical required simple work and Meyerpeter's former jobs were semi-skilled.  (Tr. 49.)  The VE testified that the jobs of housekeeper, a ticket taker, and usher met the requirements of the first hypothetical and exist in the local and national economy.  (Tr. 49.)

The ALJ then asked the VE if her answer to the first hypothetical question would change if she further assumed that the hypothetical individual was limited to jobs that involve only low stress, meaning it required only occasional decision making.  (Tr. 49.)  The VE testified that her answer would not change.  (Tr. 50.)

Then, the ALJ asked the VE if the hypothetical individual would be able to perform the work cited in her answer to the first hypothetical question, if the hypothetical individual is limited to jobs that involve no decision-making and have only occasional changes in the work setting.  (Tr. 50.)  The VE testified that such limitations would preclude competitive employment because all jobs require decision making to some extent.  (Tr. 50.)

Next, the ALJ asked how many unexcused or unscheduled absences do employers customarily expect or tolerate from their employees per month. (Tr. 50.) The VE testified that although it depends on the setting, entry level employers will not allow more than one absence and usually will not tolerate any absences in the first few months of employment. (Tr. 50.) She also testified that an employee would not be able to maintain employment if he or she had between one and five absences each month. (Tr. 50.) The VE testified that her entire testimony was consistent with the *Dictionary of Occupational Titles* ("DOT").[1] (Tr. 51.)

## B.    Medical Records

On May 1, 2008, Meyerpeter visited Dr. Paul Vatterott, complaining of heart palpitations and her legs needing to be moved constantly. (Tr. 329.) She reported that it was making her more depressed. (Tr. 329.) Dr. Vatterott determined that Meyerpeter was very anxious and that her major problems were restless legs, anxiety, and recurrent palpitations. (Tr. 329.) Dr. Vatterott diagnosed Meyerpeter with paroxysmal supraventricular tachycardia[2] (PSVT), hypothyroidism, diabetes mellitus, depressive disorder and sleep-related movement disorder. (Tr. 330.)

On May 14, 2008, Dr. Marlon Mangahas, completed a psychosocial evaluation regarding Meyerpeter. (Tr. 322-324.) Dr. Mangaha observed that Meyerpeter's appearance was disheveled, her affect was labile, and her mood was anxious, but her attitude was cooperative, her psychomotor activity was calm, and her speech was normal. (Tr. 323.) Dr. Mangahas assessed no current suicide risk or homicidal ideation present and assessed that Meyerpeter's recent and remote memory were intact, as was her concentration, and that she had an average

---

[1] U.S. Department of Labor (4th ed. rev. 1991). The SSA takes administrative notice of the *Dictionary of Occupational Titles*. *See* 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).
[2] Rapid beating of the heart in short spasms above the ventricles. Stedman's Medical Dictionary 1318, 1732, 1782 (27th ed. 2000).

level of intellectual functioning. (Tr. 324.) Dr. Mangahas's diagnosis included impressions of bipolar disorder, Type II; depression; and chronic mental illness. (Tr. 324.)

On June 19, 2008, Meyerpeter visited Dr. Vatterott for a follow-up visit. (Tr.327-28.) Dr. Vatterott diagnosed Meyerpeter with depressive disorder, PSVT, diabetes mellitus II, and sleep-related movement disorder. (Tr. 328.) Upon learning that Meyerpeter had taken off from work and planned a trip to Florida, he recommended rest and exercise. (Tr. 328.)

On September 22, 2008, Meyerpeter visited Dr. Sarwath Bhattacharya, complaining of depression, leg pain, hypertension, pulmonary emboli, and a heart condition. (Tr. 414.) Dr. Bhattacharya diagnosed Meyerpeter with hypothyroidism, leg pain, hypertension, pulmonary emboli, and history of supraventricular tachycardia. (Tr. 416.)

On September 22, 2008, Meyerpeter also visited licensed psychologist Sherman Sklar complaining of irritability, heart palpitations, and severe depression. (Tr. 422.) Sklar diagnosed Meyerpeter with dysthymic disorder, dependent personality disorder and assessed a Global Assessment Functioning score ("GAF")[3] of 54. (Tr. 425.) Sklar's prognosis was that "[n]o change is expected even with continued out-patient treatment." (Tr. 425.)

On October 21, 2008, Dr. Kyle Devore performed a psychiatric review regarding Meyerpeter. (Tr. 426-437.) Dr. Devore determined that Meyerpeter had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties maintaining concentration, persistence, and pace. (Tr. 434.) Dr. Devore also determined that Meyerpeter's limitations are non-severe based on the medical evidence and alleged symptoms. (Tr. 436.) He considered that she has a long history of substantial gainful employment in a

---

[3] The Global Assessment of Functioning (GAF) is a numeric scale used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. DSM-IV 32 (4th ed. 2000). A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

public medical setting and there is no evidence that her symptoms have increased since that time. (Tr. 436.)

On July 6, 2009, Meyerpeter visited the emergency room complaining of shortness of breath and heart palpitations. (Tr. 460.) Meyerpeter received a diagnosis of suspect asmara[4] [sic]; mild chronic obstructive pulmonary disease ("COPD"); and anxiety. (Tr. 467.) Meyerpeter was instructed to follow up with Dr. Huhn-Usry within two to four days. (Tr. 467.)

On August 14, 2009, Meyerpeter visited Dr. R. Arain at Center Pointe Hospital. (Tr. 560-563.) Dr. Arian observed depressed mood and blunted affect, but coherent and logical speech, alert and oriented senses, intact recent and remote memory, average intellect, intact concentration, and fair judgment. (Tr. 563.) Dr. Arain listed Meyerpeter's strengths as "verbal, motivated" and her weaknesses as "chronic mental illness, poor coping skills, and limited social support." (Tr. 563.) Dr. Arain diagnosed Meyerpeter with major depressive disorder ("MDD"), which was recurrent; personality disorder; and chronic mental illness. Dr. Arain assessed Meyerpeter with a GAF of 40[5]. (Tr. 563.)

On August 17, 2009, Meyerpeter visited Dr. Huhn-Usry again, reporting fatigue, fevers or night sweats, problems with teeth or gums, shortness of breath, difficulty breathing, chest pain, heart palpitations, nausea or vomiting, numbness or tingling, pain in joints, back, or limbs, depression, and problems sleeping. (Tr. 518.) Dr. Huhn-Usry indicated that there were no significant changes since the last visit. (Tr. 519.)

On September 16, 2009, Meyerpeter visited Dr. Mark Chin. (Tr. 487-489.) Dr. Chin diagnosed Meyerpeter with atypical chest pain with shortness of breath, of which the etiology

---

[4] This appears to be a typographical error in the medical record. Based on the record, it appears that it should say asthma.
[5] A GAF of between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. DSM-IV 32 (4th ed. 2000).

was unclear; possible COPD or asthma; history of SVT, and status-post radiofrequency ablation in 2005. (Tr. 488.)

On September 21, 2009, Dr. Shiraz Daud, examined Meyerpeter upon a referral from Dr. Huhn-Usry for evaluation regarding Meyerpeter's shortness of breath. (Tr. 487-501.) Dr. Daud determined that Meyerpeter's bronchial challenge test results showed positive results for reversible obstructive airways disease. (Tr. 501.) Dr. Daud also determined that Meyerpeter's pulmonary function test showed there was mild obstructive and mild restrictive ventilatory defect with no clear and significant bronchodilator response, and the DLCO was normal. (Tr. 504.)

On October 7, 2009, Dr. Daud diagnosed Meyerpeter with asthma, possible obstructive sleep apnea ("OSA"), and allergic rhinitis. (Tr. 496.)

On October 11, 2009, Dr. Daud completed a physical residual functional capacity ("RFC") questionnaire for Meyerpeter. (Tr. 541-545.) He diagnosed her with mild asthma, giving her a favorable prognosis. (Tr. 541.) Dr. Daud opined that Meyerpeter's impairment had lasted or could be expected to last for 12 months. (Tr. 541.) Dr. Daud indicated that Meyerpeter was affected with anxiety. (Tr. 541.) Dr. Daud indicated her symptoms would only occasionally interfere with her attention and concentration required to perform even simple tasks, and she could tolerate moderate work stress. (Tr. 542.) Dr. Daud opined that Meyerpeter could continuously sit and stand more than two hours, she did not need walking around periods during an eight-hour workday; she did not need to be able to shift positions; she did not need to elevate her legs; and she did not need a cane. (Tr. 542-543.) He also indicated that Meyerpeter could frequently carry up to 20 pounds and occasionally carry up to 50 pounds; frequently turn her head in all directions, frequently crouch with occasional twisting, bending, or climbing, and she had no significant limitations reaching, handling, or fingering. (Tr. 544.) Dr. Daud also opined

that Meyerpeter could use her fingers, and arms to grasp, make fine manipulations, and reach, overhead one hundred percent of the time. (Tr. 544.) Dr. Daud also indicated that Meyerpeter's impairment or treatment may result in her being absent from work two days per month. (Tr. 544.) Dr. Daud opined that Meyerpeter's impairments were not reasonably consistent with the symptoms and functional limitations he found, noting that there was "mild asthma [and] lack of bronch spasm yet no functional capacity." (Tr. 542.)

On October 14, 2009, Dr. Chin opined that Meyerpeter had a New York Heart Association's Classification Class II, based on the stress echo study performed that day. A Class II designation includes "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, and dyspnea or angina pain." (Tr. 511.)

### III.
### DECISION OF THE ALJ

The ALJ found that Meyerpeter met the insured status requirements of the Social Security Act on May 10, 2008 and remained insured throughout the period of the decision. (Tr. 11.) The ALJ found that Meyerpeter had not engaged in substantial gainful activity since May 10, 2008. (Tr. 11.) The ALJ found that she had severe impairments of major depressive disorder and asthma, noting that "the anxiety is considered a symptom of depression." (Tr. 11.) The ALJ found that Meyerpeter's condition did not meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1, noting in particular that neither "A" nor "B" criteria had been satisfied for affective disorders under listing 12.04. (Tr. 12.)

Regarding Meyerpeter's RFC, the ALJ determined:

[s]ince May 10, 2008, the claimant has had the RFC to lift or carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, and stand and/or walk a total of six hours in an eight-hour day, but she has had to

avoid concentrated exposure to cold, heat, wetness, humidity, air-borne irritants and chemicals, has been able to climb ladders, ropes or scaffolds, and the tasks have had to be of a simple, routine, repetitive, low-stress nature ("low stress" being defined as an absence of production quotas and only an occasional requirement for making decisions) . . . [which] constitutes a limited range of unskilled light work.

(Tr. 12.)   Based on this RFC and Meyerpeter's age, education, and work experience, the ALJ found that Meyerpeter could perform work that exists in significant numbers in the national economy.   (Tr. 14.)   Finally, the ALJ determined that Meyerpeter had not been disabled in accordance with the Social Security Act.   (Tr. 14.)

## IV.
## STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[6] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform

---

[6] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id. See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed

because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989). Additionally, an ALJ's decision must comply "with the relevant legal requirements." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible. *Goff*, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical"); *Rautio*, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the claimant's subjective complaints of pain for legally sufficient reasons. *Baker v. Barnhart*, 457 F.3d 882, 894-95 (8th Cir. 2006); *Carlock v. Sullivan*, 902 F.2d 1341, 1343 (8th Cir. 1990); *Hutsell v. Sullivan*, 892 F.2d 747, 750 (8th Cir. 1989).

## V.
## DISCUSSION

Meyerpeter makes four arguments on appeal. First, Meyerpeter argues that the ALJ improperly failed to include all of her impairments in the hypothetical questions to the VE. Second, Meyerpeter argues that the ALJ did not give proper weight to the opinion of Dr. Daud,

Meyerpeter's treating physician, that she would likely be absent from work as a result of her impairments or treatment. Third, Meyerpeter argues that the ALJ improperly determined that her heart palpitations had not been severe. Finally, Meyerpeter argues that the ALJ failed to properly consider her credibility.

### A.     ALJ's Hypothetical Question to the VE

Meyerpeter argues that the VE's testimony does not constitute substantial evidence according to *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996), because the ALJ included the limitation that Meyerpeter must "avoid concentrated exposure to . . . air-borne irritants and chemicals" in his written decision, but did not include the limitation in the hypothetical question to the VE. The Commissioner asserts that the error is harmless, because none of the jobs identified by the VE require significant exposure to air-borne irritants and chemicals.

The ALJ's decision states that Meyerpeter has the RFC to

> lift or carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, and stand and/or walk a total of six hours in an eight-hour day, but she has to avoid concentrated exposure to cold, heat, wetness, humidity, air-borne irritants and chemicals, has been able to climb ladders, ropes, or scaffolds, and the tasks have had to be of a simple, routine, repetitive low-stress nature ("low stress" being defined as an absence of production quotas and only an occasional requirement for making decisions.

(Tr. 12.) The ALJ did not include the limitations of "avoid concentrated exposure to . . . air-borne irritants and chemicals in his hypothetical to the VE. (Tr. 48-50.) The VE testified that Meyerpeter could perform the jobs of housekeeper, usher, and ticket taker. (Tr. 49.) The VE also testified that his testimony was consistent with the DOT.

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." *Newton*, 92 F.3d at 694-695. "An expert's testimony based upon an insufficient hypothetical question may not

constitute substantial evidence to support a finding of no disability.  *Newton*, 92 F.3d at 695.  An error in posing the hypothetical question may be harmless, however, if there is no conflict with the VE's testimony and the DOT or there is no indication that the ALJ would have decided the case differently.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (ALJ error harmless where ALJ misread doctor's handwriting regarding whether claimant could "walk" or "work," because no indication that ALJ's decision would be different had he read the doctor's note correctly); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (ALJ error in failing to ask VE about possible conflicts between testimony and DOT harmless, since no conflict existed).

In this action, the Court finds that the ALJ's exclusion of the limitation in the hypothetical was error.  None of the three jobs identified by the VE, however, require exposure to air-borne irritants or chemicals[7], so the omission of the limitations would have had no effect on the VE's testimony.  *See DOT* 323.687-014, 1991 WL 672783 (housekeeper) (exposure to atmospheric conditions, toxic caustic chemicals, and other environmental conditions not present); DOT 344.667-010, 1991 WL 672863 (ticket taker) (exposure to atmospheric conditions, toxic caustic chemicals, and other environmental conditions not present); DOT 344.677-014, 1991 WL 672865 (usher) (exposure to atmospheric conditions, toxic caustic chemicals, and other environmental conditions not present).  Accordingly, the error was harmless and the point is denied.

---

[7] Appendix D to the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* states that exposure to toxic caustic chemicals means "exposure to possible bodily injury from toxic or caustic chemicals."  SCODICOT APP D (Westlaw).  Exposure to atmospheric conditions is "exposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation that affect the respiratory system, eyes, or the skin." *Id.*  Other environmental conditions include conditions not elsewhere defined. *Id.*

**B.      Weight of Dr. Daud's Opinion**

Next, Meyerpeter argues that the ALJ failed to consider and give proper weight to the portion of Dr. Daud's opinion that Meyerpeter would likely miss two days of work per month due to asthma.  (Tr. 544.)  Meyerpeter asserts that if the ALJ had given Dr. Daud's opinion its proper weight, then the ALJ would have had to find her incapable of remunerative employment in light of the VE's testimony that an entry level employer would not tolerate more than one absence per month from an employee.  (Tr. 50.)

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record."  20 C.F.R. § 404.1527(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).  Although a treating physician's opinion is generally given controlling weight, it is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  An ALJ must give a treating physician's opinion controlling weight only if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937.

"Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation."  *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000) citing 20 C.F.R § 404.1527(d)(2); *see also* SSR 96-2p; 416.927(d)(2).  For example, an ALJ may discount or disregard a treating physician's opinion where other medical assessments in the record are supported by better or more thorough medical evidence, *see Rogers v. Chater,* 118

F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions, *see Hacker*, 459 F.3d at 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.") (citation omitted); *see also Cruze v. Chater,* 85 F.3d 1320, 1324-25 (8th Cir. 1996).

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

In this case, the ALJ's RFC includes limitations identified in Dr. Daud's opinion contained in the Physical Residual Functional Capacity Questionnaire completed in October 2009. (Tr. 541-545.) The ALJ also references Dr. Daud's medical records regarding Meyerpeter's pulmonary functional and bronchial challenge test results. (Tr. 496-507.) For example, the RFC and Dr. Daud's opinion both include that Meyerpeter has the ability to carry 20 pounds occasionally and 10 pounds frequently (Tr. 12, 543) and the (2) ability to climb ladders and stairs (Tr. 12, 544). Consistent with Dr. Daud's opinion and treatment records, the ALJ determined that (1) Meyerpeter's asthma was mild (Tr. 13, 496, 501, 504, 541), (2) she had normal respiratory findings (Tr. 13, 496, 499), and (3) her asthma improved with medication (Tr. 13, 496, 501, 504.) The ALJ references the above citations and also specifically mentions that Dr. Daud opined that Meyerpeter could lift or carry up to fifty pounds occasionally, despite her asthma. (Tr. 13, 543.) Dr. Daud also stated that Meyerpeter had a good prognosis. (Tr. 541.) Based on the ALJ's extensive reliance on Dr. Daud's treatment records, the Court finds it likely

that the ALJ considered and rejected Dr. Daud's indication that Meyerpeter would need to be absent from work twice a month as inconsistent with Dr. Daud's treatment records and the record as a whole. Accordingly, the Court finds that the ALJ's properly considered Dr. Daud's opinion regarding Meyerpeter's functional limitations as related to her asthma.

### C. Severity of Meyerpeter's Heart Palpitations

Then, Meyerpeter argues that the ALJ failed to properly consider all of her severe medically determinable impairments, specifically her heart palpitations. Meyerpeter alleges that the heart palpitations are severe because they interfere with her ability to perform ordinary physical activities, which she argues are the same as the "basic work activities" of sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, or handling. (Pl's. Br. 10.) This is not the correct standard. To be considered severe, an impairment must *significantly* limit a claimant's ability to do basic work activities. *See* 20 C.F.R § 404.1520(c). Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not 'severe.'" *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari,* 264 F.3d 751, 754; 20 C.F.R. § 416.920(a)(4)). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue,* 484 F.3d at 1043). "It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Id.* (citing *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000)). "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard." *Id.* at 708.

The ALJ referred to substantial record evidence which supports his determination that Meyerpeter's heart palpitations were not severe because they did not significantly limit her physical ability to perform work activities. Dr. Vatterott, in his report dated June 19, 2008, noted that he told Meyerpeter that the VPCs were not a threat to her and that exercise and rest would help. (Tr. 328.) Dr. Huhn-Usry instructed Meyerpeter to increase daily exercise in response to a finding of high bad cholesterol. (Tr. 522.) Additionally, the results of an echocardiogram performed at St. Luke's Hospital in September 2009 showed normal left ventricular systolic function and the appearance of a structurally normal aortic valve. (Tr. 409.) Furthermore, at a consultation to evaluate her heart palpitations in September 2009, Meyerpeter told the physician that she had experienced only two episodes of near syncope and that, since 2005, she had experienced palpitations with only occasional episodes of rapid heart rates which usually lasted for a few minutes and resolved spontaneously. (Tr. 487.) Finally, in October 2009, Dr. Chin, a cardiologist and Meyerpeter's treating physician, indicated that Meyerpeter's appropriate heart classification was Class II, which encompassed "[p]atients with cardiac disease resulting in *slight* limitation of physical activity." (Tr. 511 (emphasis added).)

A bilateral carotid duplex ultrasound exam given on August 20, 2008, was within normal limits, without evidence of hemodynamically significant stenosis, and showed normal ategrade flow in the vertebral arteries. (Tr. 575.) At her internal medicine examination with Dr. Bhattacharya on September 22, 2008, Meyerpeter reported that she denied any history of: syncope, light-headedness or dizziness; orthopnea or paroxysmal nocturnal dyspnea; pedal edema; or congestive heart failure. (Tr. 414.)

Meyerpeter's physicians also opined on numerous occasions that her heart rhythm was normal. On May 1, 2008, Dr. Vatterott opined that Meyerpeter's heart had a regular rate and

rhythm without murmurs or gallops. (Tr. 329.) On August 20, 2008, Dr. Bollis observed regular heart rhythm and no murmur or gallops. (Tr. 574.) On July 6, 2009, Dr. Wessely observed regular heart rate and rhythm, normal peripheral perfusion, and no murmur or edema. (Tr. 463.) On September 26, 2009, Dr. Chin, observed a regular rhythm; normal S1 and S2; no murmur, gallops, or rubs; and that the PMI was not displaced. (Tr. 488.) On his own examination, Dr. Bhattacharya observed that Meyerpeter's heart rate was 93 beats per minute with regular sinus rhythm and that there was no appearance of any tachycardia at that time. (Tr. 415.) Dr. Bhattacharya also observed stable S1 and S2, stable hypertension, and no heart murmurs. (Tr. 415-16.) On October 7, 2009, Dr. Daud observed: normal S1 and S2; no murmurs, rubs, nor gallops; distal pulses were palpable; and varicosities were not seen. (Tr. 496.)

Based on the foregoing, the Court finds that substantial evidence in the record as a whole supports the ALJ's finding that Meyerpeter's heart palpitations were not a severe impairment.

### D. Meyerpeter's Credibility

Finally, Meyerpeter argues that the ALJ failed to properly consider her credibility. The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) claimant's daily activities; (2) subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) dosage, effectiveness, and side effects of any medication; and (5) claimant's functional restrictions. *Polaski*, 739 F.2d at 1322.

In his credibility determination, the ALJ first noted that Meyerpeter had been caring for her "nonfunctional" mother with Alzheimer's disease, which was inconsistent with the existence of a disabling mental condition. (Tr. 13.) Meyerpeter argues that the ALJ should have also

considered that her brother moved in to help her with her mother and that Meyerpeter moved out of her home for several months to "get away from everything." (Pl.'s Br. 12; Tr. 38.) Meyerpeter's counterargument does not carry much weight, because according to her testimony, her brother stayed with her mother when Meyerpeter was not there and eventually moved out when Meyerpeter returned. (Tr. 38.)[8] Moreover, Meyerpeter testified that although her mother can feed and dress herself, "she can't take care of herself at all" and "doesn't remember anything." (Tr. 44.) See *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) (fact that claimant was primary caregiver to daughter with cerebral palsy when assistant was absent supported ALJ's decision to discredit claimant's subjective complaints).

Meyerpeter also performed certain small chores around the house like preparing simple meals, performing light cleaning and housework, and washing laundry and dishes. (Tr. 44, 159, 170, 322, 422.) She also shopped for groceries and would sometimes drive to doctors' appointments or her part-time job when she worked. (Tr. 30.) She also handled her finances, paying bills, handling a savings account, using a check book or money orders, and counting change. (Tr. 161, 172.) She even planned a trip to Florida four weeks after her alleged disability onset date. (Tr. 328.) These activities are inconsistent with complaints of disabling limitations. *See Medhag v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling [impairments]"). Accordingly, the ALJ's credibility determination of Meyerpeter's daily activities is supported by substantial evidence on the record as a whole.

Second, the ALJ noted that Meyerpeter had longstanding depression without objective medical evidence of significant deterioration, which was inconsistent with Meyerpeter's allegations that she was disabled when she had been able to engage in substantial gainful

---

[8] In 2008, Meyerpeter reported to Dr. Sklar that her brother lived with her. (Tr. 422, 424.)

activity. (Tr. 13.) Meyerpeter states that her work activity should not detract from her credibility. Work activity can detract from a claimant's credibility. *See* 20 C.F.R. §§ 404.1571, 516.971 (past work may show ability to work at the substantial gainful activity level); *Goff v. Barnhart*, 421 F.3d at 792 (inconsistencies between subjective complaints and work and daily activities diminished claimant's credibility); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was . . . not unreasonable for the ALJ to note that [the claimant's] daily activities, including part-time work, . . . were inconsistent with her claim of disabling pain.").

Meyerpeter's citations to *Kelley v. Callahan*, 133 F.3d 583 (8th Cir. 1998), and *Cline v. Sullivan*, 939 F.2d 560 (8th Cir. 1991), are inapposite. In *Kelley*, the Court found that the claimant's ability to work should not have detracted from her credibility, because the Court found that the claimant's continued employment was only through the good graces of her employer who accommodated her by allowing her many absences from work so that she could receive treatment and accrue enough time to be eligible for her pension. *Kelley*, 133 F.3d at 588. In *Cline*, the Court found that claimant's employer tolerated her limitations and deliberately restricted her on the job duties to tasks that she was capable of performing. *Cline*, 939 F.2d at 566.

Meyerpeter's part-time employer for several years, Clarkson Eyecare ("Clarkson"), completed a questionnaire about Meyerpeter's work activities. (Tr. 120-121.) In its responses, Clarkson stated that Meyerpeter worked the same job for the same pay as other employees with "no special treatment." (Tr. 121.) Clarkson further indicated that Meyerpeter's work was performed in a satisfactory manner, up to industry standards. (Tr. 121.) In a letter dated May 4, 2009, Clarkson stated that Meyerpeter worked an average of 10-14 hours a week, sometimes reaching 15 or more hours a week, even after her alleged onset date in May 2008. (Tr. 197.)

Clarkson stated that the number of hours Meyerpeter worked "is based upon the needs of Clarkson Eyecare, and therefore, her hours are not guaranteed." (Tr. 197.) Furthermore, she stood or walked most of the workday, interacted with customers in sales, with questionnaires, and over the phone, and recorded their information on forms. (Tr. 32, 35, 138, 146.) This evidence weighs against her credibility. Accordingly, the Court finds the ALJ's determination that Meyerpeter's ability to work a part-time job without restrictions or accommodations weighed against her credibility is supported by substantial evidence on the record as a whole.

Third, the ALJ discussed Meyerpeter's intensity and frequency of symptoms. Meyerpeter complained of agitation and difficulty concentrating, but the ALJ found the complaints inconsistent with her ability to perform work as an optician's assistant and retail sales clerk in the past when this work involved frequent interaction with the public. Moreover, Meyerpeter smoked tobacco in spite of her asthma, which the ALJ found inconsistent with her claim that her symptoms have been so intense or frequent as to be disabling. Regarding medication, Meyerpeter testified that her medication puts her in a fog without making the same complaint to a treating source, which is inconsistent with her claim that she experienced this side effect.

Meyerpeter smoked up to one and one-half packs a day during the relevant time period despite her asthma. (Tr. 322, 373, 461-62, 498, 553.) *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)) ("[I]mpairments that are controllable or amenable to treatment, including certain respiratory problems, do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits."). Additionally, it was observed on multiple occasions that her respiration was

normal and her lungs were clear to auscultation. (Tr. 329, 365, 374, 380, 415, 463, 488, 496, 499, 519, 574.) Dr. Daud observed that Meyerpeter's asthma symptoms were mild and improved with medication. (Tr. 501, 504, 507.)

Regarding her allegations of depression and anxiety, it was noted that Meyerpeter tended to be noncompliant with her medications. (Tr. 461.) *Wildman v. Astrue*, 596 F.3d at 965-66 ("noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion"); *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (ALJ may properly consider noncompliance in determining claimant's credibility); 20 C.F.R. §§ 404.1530, 416.930 (unjustified failure to follow prescribed treatment is grounds for denying disability). Despite depression, Sklar observed that Meyerpeter was well oriented to person, time, and place, she had good memory and judgment, and she could do simple math problems. (Tr. 424.) Dr. Arain observed normal attitude and behaviour, logical and goal-directed thought processes, logical and coherent speech, intact recent and remote memory, average intellect, and normal concentration. (Tr. 562-563.) Dr. Mangahas observed some anxiety, but Meyerpeter was cooperative, calm, had labile affect, normal speech, average intellectual functioning, and normal memory and concentration. (Tr. 323-324.) Dr. Devore assessed that Meyerpeter had only mild restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 434.) Meyerpeter visited Dr. McCracken for only two therapy sessions between July and August 2009, missing subsequent appointments. (Tr. 534.)

Upon review of the evidence as a whole, the ALJ made express credibility determinations and referenced evidence in the record supporting his findings; therefore, substantial evidence in the record as a whole supports the ALJ's credibility determinations.

## VI.
## CONCLUSION

For the reasons set forth above, the Court finds that the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Meyerpeter seeks in her Complaint and Brief in Support of Plaintiff's Complaint is **DENIED**.  [Docs. 1, 13]

A Judgment will be entered in a separate document.

Dated this 5th day of October, 2012

/s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
